UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REBECCA A. ROSTER,                    )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )        No.  4:13CV2395 TIA
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                    Defendant.        )

## MEMORANDUM AND ORDER

Plaintiff Rebecca A. Roster brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the Commissioner's final decision denying her

application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental security

income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters

are pending before the undersigned United States Magistrate Judge, with consent

of the parties, pursuant to 28 U.S.C. § 636(c).  Because the final decision is not

supported by substantial evidence on the record as a whole, it is reversed.

## I.  Procedural History

On January 12, 2009, plaintiff applied for DIB and SSI, claiming she

became disabled on September 12, 2008, because of back problems, fibromyalgia,

and depression.  (Tr. 252-58, 259-68, 293.)  On initial consideration, the Social Security Administration denied plaintiff's claims for benefits.  (Tr. 93, 94, 114-18.)  Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on July 20, 2010, at which plaintiff and a vocational testified.  (Tr. 71-92.)  On September 23, 2010, the ALJ issued a decision denying plaintiff's claims for benefits.  (Tr. 96-106.)  The Appeals Council subsequently granted plaintiff's request for review and, on March 8, 2012, vacated the ALJ's decision and remanded the matter to an ALJ for further proceedings.  The Appeals Council ordered the ALJ upon remand to consider and explain the weight accorded to the opinion evidence rendered by plaintiff's treating physician, Dr. Karlynn Sievers; give further consideration to plaintiff's maximum residual functional capacity (RFC); and obtain evidence from a vocational expert if warranted.  (Tr. 110-12.)

Upon remand, an ALJ held a supplemental hearing on July 11, 2012, at which plaintiff and a vocational expert testified.  (Tr. 32-70.)  On August 21, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform other work as it exists in significant numbers in the national economy.  (Tr. 9-27.)  On August 28, 2013, upon review of additional evidence, the Appeals Council denied plaintiff's request to review the ALJ's decision.  (Tr. 1-6.)  The ALJ's decision of August 21, 2012, is thus the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole for the reason that he failed to accord appropriate weight to the opinion of her treating physician, Dr. Sievers, as well as to the opinion of her treating psychiatrist, Dr. Maria A. Mendez. Plaintiff requests that the final decision be reversed and that she be awarded benefits, or that the matter be remanded for further consideration. Because the ALJ failed to properly consider the evidence of record in discounting the opinion of Dr. Sievers, the matter will be remanded for further consideration.

## II. Testimonial Evidence Before the ALJ

A.     <u>Hearing Held on July 20, 2010</u>

At the hearing on July 20, 2010, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-two years of age. She has three adult-aged children and lives in a ground-floor apartment with her fiancé. Plaintiff stands five feet tall and weighs 180 pounds. Plaintiff graduated from high school and thereafter received training as a certified nurse's aide (CNA). (Tr. 76-78.) Plaintiff receives Medicaid assistance. (Tr. 85.)

Plaintiff's Work History Report shows that plaintiff worked as a waitress from 1993 to 1999, and again from 2003 to 2006. From 1999 to 2003, plaintiff worked as a kitchen manager at Boys Town. In 2004 and 2005, plaintiff also

worked as a job coach for Choices for People. From 2006 to 2008, plaintiff worked as a lab technician at a dog food plant. (Tr. 321.) Plaintiff testified that she stopped working in September 2008 because she could no longer carry the heavy bags. (Tr. 80.) Plaintiff testified that she cannot perform any of her past work because she is unable to do the lifting required for the jobs. (Tr. 85.)

Plaintiff testified that she experiences pain in her legs and back that causes problems with standing. Plaintiff sits on a cushion and elevates her legs to relieve the pain. Plaintiff has had some injections to her knees and back. Plaintiff has also had physical therapy and medication prescribed for her back. Plaintiff testified that she also experiences arthritic, stabbing pain in her hips, which is aggravated when she sits for too long. (Tr. 80-81.) Plaintiff testified that she lies down for about thirty minutes four or five times during the day to relieve her pain. (Tr. 88.) Plaintiff sees Dr. Sievers for her conditions every two or three months, and has been seeing her for about five years. (Tr. 79.)

Plaintiff testified that she also suffers from depression and experiences crying spells and flashback memories. Plaintiff testified that she used to experience such episodes every day but they now occur three or four days weekly. Each episode lasts about half an hour. (Tr. 83-84.) Plaintiff testified that she last saw a psychologist about seven years prior but has been taking medication for five years. (Tr. 79-80, 83.) Plaintiff testified that the medication causes weight gain

and that some of it makes her sleepy, so she takes it at night. Plaintiff testified that she was currently trying to establish care with a psychiatrist or psychologist but was having difficulty finding a provider who takes Medicaid. (Tr. 83-85.)

As to her exertional abilities, plaintiff testified that she can stand for ten to fifteen minutes. She can sit for about fifteen minutes. (Tr. 80-81.) Plaintiff testified that she is lethargic and takes several naps during the day because she gets only four to six hours of interrupted sleep at night. (Tr. 82.)

As to her daily activities, plaintiff testified that she is able to care for her personal needs and attend to her grooming. She washes dishes for fifteen to twenty minutes at a time and engages in light cleaning and dusting. Plaintiff cannot perform household chores that involve stooping. She is able to fix meals. Plaintiff has a driver's license and is able to drive for up to thirty minutes. Plaintiff testified that she has no hobbies. She watches television during the day, but her mind wanders while doing so. (Tr. 86-88.)

B.    Hearing Held July 11, 2012

1.    *Plaintiff's Testimony*

At the supplemental hearing held on July 11, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-four years of age. Plaintiff lives in a house with her mother. Plaintiff testified that she had gained about thirty

pounds because she does not get out of bed very often.  (Tr. 37-39.)

Plaintiff testified that she has not looked for work since she left her last job in September 2008 because Dr. Sievers told her not to.  Plaintiff testified that she can no longer work because of constant pain in her back, hips, and knees.  Plaintiff rated her pain to be at a level five on a scale of one to ten and testified that she experienced such pain at that level for four or five years.  (Tr. 42-43.)  Plaintiff testified that she has difficulty concentrating because of her pain.  (Tr. 49.) Plaintiff testified that she previously participated in physical therapy from which she obtained no relief.  Plaintiff currently takes Norco for the pain but without relief.  (Tr. 43-44.)  She experiences no side effects from her medication.  (Tr. 48.) Plaintiff was scheduled to visit a pain management specialist the day following the hearing.  (Tr. 44, 58.)

Plaintiff testified that moving, walking a lot, and lifting over ten pounds aggravate her back pain but that applying heat to her low back sometimes helps. (Tr. 44.)  With respect to her hip pain, plaintiff testified that walking up stairs, sitting for too long, and standing for too long aggravate the pain.  Plaintiff testified that arthritis medication taken previously did not help.  Plaintiff testified that injections likewise did not help the pain.  (Tr. 45-46.)  Finally, with respect to her knees, plaintiff testified that she has no cartilage, which causes her bones to splinter and "float around."  Plaintiff testified that injection therapy for the

condition did not help her pain. Plaintiff testified that surgery has been recommended for the condition, but she does not want to undergo the procedure because she was advised that it may not help. (Tr. 46-47.) Plaintiff testified that she sometimes uses a cane, although one has not been prescribed. (Tr. 39.)

With respect to her mental impairment, plaintiff testified that she is depressed all of the time and does not want to get out of bed. (Tr. 48.) Plaintiff testified to having a couple of days each week when she does not get up, get dressed, or leave the house. Plaintiff testified that she just sleeps and cries on these days. Plaintiff has crying spells a few times every day that last about thirty minutes. (Tr. 56.) She sees a psychiatrist and has taken different medications for the condition but without a change in symptoms. (Tr. 49, 57.)

As to her exertional abilities, plaintiff testified that back pain limits her ability to sit to about fifteen to twenty minutes at a time. Plaintiff testified that she does not sit a lot because of the pain and spends most of the day lying down. Plaintiff testified that she can stand about fifteen to twenty minutes at a time and for a total of about one hour during an eight-hour period. Plaintiff testified that she can walk about two blocks and can lift and carry about ten pounds. (Tr. 53-54.)

As to her daily activities, plaintiff testified that she gets up at 10:00 a.m., brushes her teeth, washes her face, and gets dressed. Plaintiff testified that she no longer cooks because she does not have the energy to do it well. Plaintiff's mother

does the cooking. (Tr. 50.) Plaintiff no longer does any housework but sometimes does the dishes. Plaintiff testified that she could probably do the laundry but that her mother chooses to do it. Plaintiff sometimes shops but has difficulty if she has a long list of items to get because she cannot stand too long. (Tr. 51-52.) Plaintiff has no hobbies. She watches television for a couple of hours every day and sleeps for the remainder of the day. Plaintiff testified that she has no friends. She goes to church on Sundays and sometimes visits with family. (Tr. 52-53.)

2. *Testimony of Vocational Expert*

Michael J. Weisman, a vocational expert, testified in response to questions posed by the ALJ and counsel.

Mr. Weisman classified plaintiff's past work as a job coach as skilled and light; as a kitchen manager as skilled and medium; as an assembler as unskilled and light; as a restaurant manager as skilled and light; as a waitress as semi-skilled and light; and as a warehouse worker as unskilled and medium. (Tr. 60-61.)

The ALJ asked Mr. Weisman to assume an individual of plaintiff's age, education, and work background and to further assume the individual could perform a full range of work at the light exertional level except that she could only occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolding; could frequently balance; occasionally stoop, kneel, and crawl; and could never crouch. Mr. Weisman testified that such a person could perform

plaintiff's past work as a job coach, assembler, and restaurant manager. (Tr. 62.)

The ALJ then asked Mr. Weisman to assume that the same individual would need to have the option to alternate positions such that "after . . . sitting or standing for 30 minutes would need the option to alternate position[s] for five minutes." (Tr. 62.) Mr. Weisman testified that such a person could not perform any of plaintiff's past work but could perform work as an arcade attendant, of which 680 such jobs exist in the State of Missouri and 129,775 nationally; parking lot attendant, of which 430 such jobs exist in the State of Missouri and 42,500 nationally; and video clerk, of which 412 such jobs exist in the State of Missouri and 50,000 nationally. (Tr. 63-64.)

The ALJ then asked Mr. Weisman to assume an additional limitation in that the individual could understand, remember, and carry out simple instructions, to which Mr. Weisman testified that such a person could perform the other work to which he previously testified. (Tr. 64.)

For a fourth hypothetical, the ALJ asked Mr. Weisman to assume an individual who could perform work at the sedentary level but with limitations to only occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolding; occasional balancing, stooping, kneeling, and crouching; never crawling; and with the same requirement to alternate positions between standing and sitting as outlined in the second hypothetical. The ALJ asked Mr. Weisman to

further assume the individual to be limited to understanding, remembering, and carrying out simple instructions. Mr. Weisman testified that such a person could perform work as a food and beverage order clerk, of which 1,225 such jobs exist in the State of Missouri and 79,000 nationally; clerical mailer, of which 680 such jobs exist in the State of Missouri and 87,000 nationally; and table worker, of which 780 such jobs exist in the State of Missouri and 83,500 nationally. (Tr. 64-65.)

Finally, the ALJ asked Mr. Weisman to assume the individual would be off task approximately twenty percent of the workday, to which Mr. Weisman testified that such a person could not be competitively employed. (Tr. 65-66.)

In response to questions from counsel, Mr. Weisman testified that a person with a Global Assessment of Functioning (GAF) score below 50 would be unable to maintain competitive employment. Mr. Weisman further testified that a person who would miss work one day a week because of symptoms from her impairments could not perform competitive work. (Tr. 68-69.)

### III. Medical Evidence Before the ALJ

Plaintiff visited Dr. Karlynn D. Sievers at St. John's Clinic in Rolla on February 12, 2008, regarding her chronic back pain. Plaintiff reported that her job at the dog food factory put a lot of strain on her back every day and that Methadone[1] no longer helped the pain. Plaintiff reported that she could not afford

---

[1] Methadone, also marketed under the brand name Dolphine, is a narcotic analgesic used to

Percocet for breakthrough pain and asked that she be prescribed Vicodin. Plaintiff was diagnosed with chronic back pain. Her dosage of Methadone was increased, and Vicodin[2] was prescribed for breakthrough pain. (Tr. 368.)

On March 25, 2008, plaintiff reported to Dr. Sievers that she takes ten Vicodin a day in addition to the Methadone for pain. Plaintiff's medications were refilled, although it was noted that plaintiff was having difficulty affording them because they were not covered by her insurance. Referral to a pain clinic was considered. Plaintiff's prescription for Ritalin[3] was also refilled. (Tr. 367.)

Plaintiff visited Dr. Sievers on February 10, 2009, requesting a change in her pain medication and also requesting medication for depression. It was noted that plaintiff was currently taking hydrocodone/acetaminophen, Flexeril,[4] Prozac,[5]

relieve severe pain in people who are expected to need pain medication around the clock for a long time and who cannot be treated with other medication. *Medline Plus* (last revised Aug. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html>.

[2] Vicodin, which is also marketed under the brand names Norco and Vicoprofen, is a combination of hydrocodone (a narcotic analgesic) and acetaminophen used to relieve moderate to severe pain. *Medline Plus* (last revised Oct. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

[3] Ritalin (methylphenidate) is used to control symptoms of attention deficit hyperactivity disorder as well as to treat narcolepsy. *Medline Plus* (last revised Mar. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html>.

[4] Flexeril is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. *Medline Plus* (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

[5] Prozac (Fluoxetine) is used to treat depression and panic attacks. *Medline Plus* (last revised Nov. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html>.

Ritalin, and Dolophine. Plaintiff's prescriptions for hydrocodone/acetaminophen, Flexeril, and Prozac were refilled. (Tr. 364-66.)

On April 10, 2009, plaintiff underwent a consultative examination for disability determinations for evaluation of her chronic back pain. Plaintiff reported to Dr. David F. Engelking that she had experienced back pain for twenty years and that she stopped working in September 2008. Plaintiff reported the pain to worsen with walking, bending, stooping, and squatting. Plaintiff also reported having intermittent knee pain for several years and that her left knee locks at times. Plaintiff reported being able to lift up to twenty-five pounds. Plaintiff reported having depression her entire life and that she last saw a psychiatrist two years prior. Plaintiff reported that she sleeps for only four hours. Dr. Engelking noted plaintiff's current medications to be Methadone, Flexeril, Cymbalta,[6] and Ritalin. Plaintiff reported that she lives with her boyfriend in an apartment and that she cooks and cleans. Plaintiff reported recent weight gain due to decreased exercise. Physical examination showed no swelling, tenderness, or spasms in her shoulders, elbows, wrists, knees, hips, ankles, neck, or back. No atrophy was noted. Plaintiff was limited in her ability to bend and squat. Plaintiff was able to dress, climb up on the examination table, tandem walk, and walk on her heels and toes. Plaintiff's

---

[6] Cymbalta is used to treat depression and generalized anxiety disorder, as well as fibromyalgia and ongoing bone and muscle pain such as lower back pain or osteoarthritis. *Medline Plus* (last revised Nov. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

reflexes were normal. Range of motion examination showed plaintiff to be limited with flexion-extension of the lumbar spine, but was otherwise normal. Dr. Engelking diagnosed plaintiff with osteoarthritis of the left knee and back as well as depression. Dr. Engelking opined that plaintiff should not engage in prolonged sitting and standing and should not squat. (Tr. 369-74.)

On April 15, 2009, Stanley Hutson, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's depression was not a severe impairment. Dr. Hutson specifically opined that plaintiff's depression caused only mild limitations in her activities of daily living and in maintaining social functioning; no limitations in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. 375-85.)

Plaintiff visited Dr. Larry Marti at Rolla Orthopedics on April 15, 2009, with complaints of moderate bilateral knee pain. Plaintiff reported the pain to worsen with activity, standing, going up steps, and squatting. Dr. Marti noted plaintiff's medical history to include diagnoses of chronic back pain, fibromyalgia, and psychiatric disorder. Examination of the hips was normal. Examination of the knees showed plaintiff to have full range of motion bilaterally, but crepitus, grinding, and tenderness were noted about the left knee. X-rays of the knees showed no bony abnormalities of the left knee, but calcification was noted about

the right knee. Plaintiff was diagnosed with knee pain and chondromalacia of the left patella. Plaintiff was given instruction as to knee exercises and was given a sample of Voltaren gel.[7]  (Tr. 386-89.)

Plaintiff visited Dr. Sievers on May 1, 2009, and reported swelling in her leg since engaging in the exercises prescribed by Dr. Marti. Plaintiff also requested a refill of Ritalin, which she reported controlled her symptoms of chronic fatigue. Plaintiff also requested that her dosage of Cymbalta be increased. Plaintiff reported a "big improvement" in her depression with Cymbalta but that she still had "a little depression," which is why she wanted an increased dose. Edema about the left leg was noted with examination. Tenderness was noted with compression to the calf. Plaintiff was prescribed hydrochlorothiazide (HCTZ) for swelling. Plaintiff's prescriptions for hydrocodone/acetaminophen, Ritalin, and Cymbalta were refilled with instruction that the dosage of Cymbalta be increased. (Tr. 390-94.)

Plaintiff returned to Dr. Sievers on July 29, 2009, with complaints that her depression was not well controlled with Cymbalta. Plaintiff also reported that Ritalin no longer controlled her symptoms of chronic fatigue as it had in the past. Plaintiff reported that she slept more and had difficulty getting up, which she

---

[7] Voltaren (Diclofenac) gel is used to relieve pain from osteoarthritis. *Medline Plus* (last revised July 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a611002.html>.

believed contributed to her weight gain. Plaintiff reported having more difficulty with back pain, which she attributed in part to her weight gain. Plaintiff reported that she had better control of her symptoms with Percocet but had to change medications because of insurance. Physical examination was unremarkable, and plaintiff had full muscle strength in all extremities. Dr. Sievers prescribed Percocet[8] for chronic pain and Pristiq for depression. Plaintiff's prescription for Ritalin was refilled. Plaintiff was encouraged to lose weight and quit smoking. Medication for smoking cessation was also prescribed. (Tr. 396-401.)

Plaintiff returned to Dr. Sievers on September 21, 2009, for medication management. Cymbalta, Zanaflex,[9] Roxicodone, Percocet, and Ritalin were prescribed. (Tr. 410-13.)

On October 27, 2009, plaintiff visited Dr. Sievers and requested a referral to a psychiatrist. Plaintiff also reported that Percocet was effective for about one or two hours but would then wear off. It was noted that plaintiff had disability paperwork with her. Roxicodone and Methadone were prescribed. (Tr. 414-16.)

On that same date, October 27, Dr. Sievers completed a Medical Source

---

[8] Percocet, also marketed under the brand name Roxicodone, is a combination of oxycodone (a narcotic analgesic) and acetaminophen used to relieve moderate to severe pain. *Medline Plus* (last revised Oct. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[9] Zanaflex is a skeletal muscle relaxant used to relieve the spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury. *Medline Plus* (last revised Feb. 11, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html>.

Statement (MSS) in which she opined that plaintiff could frequently and occasionally lift and carry ten pounds; could stand and/or walk continuously for fifteen minutes at a time, for a total of eight hours a day; could sit continuously for thirty minutes at a time, for a total of eight hours a day; and could not push or pull in excess of twenty-five pounds. Dr. Sievers opined that plaintiff should never climb, stoop, kneel, or crouch, and could occasionally balance and bend. Dr. Sievers opined that plaintiff had no manipulative, communicative, or environmental limitations. Dr. Sievers opined that plaintiff would need to assume a reclining position for up to thirty minutes, one to three times a day; as well as assume a supine position for up to thirty minutes, one to three times a day to help with control of existing pain or fatigue. (Tr. 418-20.)

Plaintiff visited Dr. Sievers at the Mercy Clinic in Rolla on January 3, 2010, with regard to complaints relating to a fractured orbit and resulting loss of teeth. Dr. Sievers noted plaintiff's chronic fatigue to be stable and well controlled with Ritalin. Examination of the back showed pain with motion and tenderness in the paraspinous muscles in the lumbar spine. No edema was noted about the extremities. Plaintiff's prescriptions for Methadone, oxycodone, oxycodone/ acetaminophen, and methylphenidate (Ritalin) were refilled. (Tr. 459-60.)

Plaintiff visited Tracy L. Fair-Parsons, a physician's assistant at the Mercy Clinic, on January 26, 2010, after having fallen down some stairs. Plaintiff

reported having spasms and sharp pain in her back that was different from her chronic pain. Tenderness was noted over the lumbar muscles. Plaintiff was diagnosed with lumbar sprain and strain and chronic back pain. Diclofenac gel was prescribed. (Tr. 461.) A trigger point injection was administered on January 28 in response to plaintiff's complaint that the gel did not help her pain. (Tr. 462.)

Plaintiff visited the emergency room at Phelps County Regional Medical Center (PCRMC) on January 31, 2010, with complaints of back spasms relating to her recent fall. No tenderness or swelling was noted about the extremities, and plaintiff had full range of motion about the extremities. A contusion was noted about the thoracic area of the back, and plaintiff's low back was tender. Plaintiff was discharged that date in stable but unchanged condition. (Tr. 423-24.)

Plaintiff visited the emergency room at PCRMC on February 13, 2010, after having been involved in a motor vehicle accident. Plaintiff was diagnosed with cervical strain and was discharged that same date in stable condition. (Tr. 425-26.) Plaintiff returned to the emergency room on March 6 with continued complaints of neck pain. Muscle spasms and tenderness were noted about the neck. Plaintiff was diagnosed with acute myofascial cervical strain and was discharged that same date in stable condition. (Tr. 427-28.)

On February 16, 2010, plaintiff visited Dr. Georgeanne Freeman at Mercy Clinic for follow up of her back pain. Plaintiff reported that medication, rest,

manipulation, and certain positions helped the pain but that the pain worsened with bending, twisting, prolonged standing, and prolonged sitting. No tenderness was noted with musculoskeletal examination. Plaintiff also reported having anxiety and depression and that her medication was not providing enough relief. Dr. Freeman noted plaintiff to be anhedonic and depressed. Plaintiff was prescribed Methadone for her chronic back pain and osteoarthritis of the knee. Plaintiff was also referred to psychiatry. (Tr. 463-64.)

Plaintiff returned to the Mercy Clinic on February 19, 2010, and saw Dr. Michael Ray Butner for her chronic back pain. It was noted that plaintiff had previously been referred to a pain specialist but that she did not want to make the car trip. Dr. Butner recommended that plaintiff accept the referral for pain management, but plaintiff indicated that it would not be convenient for her. Plaintiff insisted that she be prescribed additional pain medication so that she would not "feel bad," and she refused to submit to an examination. Dr. Butner explained that he was not comfortable with prescribing additional narcotic pain medication, and plaintiff terminated the examination. (Tr. 466.)

Plaintiff visited Dr. Lee Parks at PCRMC on March 30, 2010, and complained of pain in her joints, low back, hips, feet, and hands, and that she experienced such pain at a level eight or nine on a scale of one to ten. Plaintiff reported that pain radiated down her leg and that her legs swell when she exercises.

Plaintiff also reported that she does not sleep well and wakes every hour or two. Dr. Parks noted plaintiff to have a flat affect. Moderate somatic dysfunction about the thoracic, lumbar, pelvic, and sacrum regions was noted, and osteopathic manipulative treatment (OMT) was applied. Plaintiff was diagnosed with depression, musculoskeletal pain syndrome, insomnia, and somatic dysfunction. Remeron,[10] Methadone, and Roxicodone were prescribed. ( Tr. 435-36.)

Plaintiff returned to Dr. Parks on April 6, 2010, and reported her right hip and knee pain to be at a level four. Plaintiff also reported that she was sleeping much better. Plaintiff reported her medication to be helpful but that she was out of Roxicodone. Physical examination showed spasms about the thoracic, lumbar, and pelvic regions. Dr. Parks noted plaintiff's affect to continue to be flat. OMT was administered and plaintiff was given instruction as to stretching exercises. Plaintiff was instructed to increase her dosage of Remeron, and Roxicodone was refilled. Plaintiff was referred to Dr. Frederick for evaluation of knee pain. (Tr. 437- 38.)

Plaintiff visited Dr. Keith J. Frederick on April 9, 2010, for evaluation of intermittent right hip and knee pain. Plaintiff reported that the pain had worsened during the previous couple of weeks. Plaintiff reported that going up stairs aggravates the knee pain and that she also experiences snapping, popping, and

---

[10] Remeron is used to treat depression. *Medline Plus* (last revised Feb. 15, 2013)<http://www. nlm.nih.gov/medlineplus/druginfo/meds/a697009.html>.

occasional buckling of the knee. With respect to her hip, plaintiff reported that she cannot lay on her right side because of the pain and that the pain worsens when she is up and active. Examination of the right knee showed tenderness and mild crepitus. X-rays showed some degenerative changes associated with osteoarthritis but no acute bony abnormalities. Examination of the right hip showed full range of motion but with discomfort. Severe tenderness was noted about the greater trochanteric bursa. X-rays of the hip showed no acute bony abnormalities. Dr. Frederick diagnosed plaintiff with right knee pain of unknown etiology and bursitis of the right hip. Torn cartilage of the knee was suspected, but plaintiff reported that she wanted to avoid surgery. An appointment was made for steroid injections to be administered to the knee and hip. (Tr. 431.)

Plaintiff returned to Dr. Parks on April 16, 2010, with complaints associated with bronchitis. Plaintiff reported her back pain to have moved to the lower thoracic region and to be exacerbated by her cough. Plaintiff reported having less pain in her hips and that she was sleeping better. Remeron was noted to be helping. Plaintiff was instructed to decrease her Methadone. Medication was prescribed for bronchitis. Trazodone[11] was also prescribed, and plaintiff's Roxicodone was refilled. Somatic dysfunction of the thoracic region was noted to

---

[11] Trazodone is used to treat depression and is sometimes used to treat insomnia, anxiety, and schizophrenia. *Medline Plus* (last revised Nov. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

be severe, with dysfunction of the lumbar and sacrum regions continuing to be moderate. OMT was administered. In addition to bronchitis, plaintiff was diagnosed with somatic dysfunction and bipolar depression. (Tr. 439-40.)

Dr. Frederick administered steroid injections to the knee and hip on April 20, 2010. (Tr. 432.) On April 23, plaintiff reported to Dr. Parks that her knee pain was better after having received the injection, but that her right hip ached. Dr. Parks noted plaintiff to have tolerated the decrease in Methadone, but plaintiff reported having relief for only two or three hours. It was noted that plaintiff's mood was better, and plaintiff reported that she was planning a fortieth birthday party for her husband. Dr. Parks instructed plaintiff to further decrease her dosage of Methadone. Additional stretching exercises were provided, and plaintiff's prescriptions for Roxicodone and Flexeril were refilled. (Tr. 441.)

On April 30, 2010, plaintiff reported to Dr. Parks that she had been working on her stretches, and her entire back was stiff and sore. Plaintiff's back was very tight upon examination. Plaintiff was also noted to have a flat affect but to be cooperative. Plaintiff was instructed to increase her Methadone in the morning and to continue with Trazodone and Roxicodone. Plaintiff was diagnosed with bipolar depression and chronic pain syndrome of the back and hip. (Tr. 442.)

Plaintiff returned to Dr. Parks on June 18, 2010, and reported that she was getting four to six hours of sleep. Physical examination showed plaintiff able to

stretch her hamstrings much better and to bend forward to seventy degrees, which was noted to be much improved. Dr. Parks noted plaintiff's mood to be hopeful and cheerful. Plaintiff was encouraged by the possibility of further decreasing her need for medication. Plaintiff was instructed to decrease her dosage of Methadone. Plaintiff was prescribed Lisinopril for hypertension. Trazodone and Roxicodone were refilled. (Tr. 443.)

On October 25, 2010, plaintiff visited Dr. Maria A. Mendez at the Center for Psychiatric Services with complaints of depression and having panic attacks. Plaintiff reported getting about four hours of sleep at night and that she usually does not nap. Plaintiff reported having crying spells five or six times a week. Plaintiff reported that treatment had been recommended for her mental condition but that Dr. Parks did not want to provide the treatment. Plaintiff reported that she had been previously diagnosed with attention deficit hyperactivity disorder. Plaintiff reported having depression for most of her life and having anxiety since her twenties. Plaintiff reported that panic attacks prevented her from driving for two years. Plaintiff also reported a history of being sexually and physically abused. Dr. Mendez noted plaintiff's current medications to include Methadone, Percocet, Vistaril,[12] HCTZ, and Neurontin.[13] Plaintiff's past medical history was

---

[12] Vistaril (Atarax) is used to treat anxiety. *Medline Plus* (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

[13] Neurontin (Gabapentin) is used to relieve the pain of post-herpetic neuralgia and to treat

noted to include compressed discs at the L4-L5 level and arthritis of the hips and knees.  Mental status examination showed plaintiff to look sad.  Plaintiff reported having suicidal thoughts, but not strong ones.  Plaintiff's memory was noted to be intact.  Plaintiff was diagnosed with major depressive disorder, recurrent, severe; sexual abuse as a child; post-traumatic stress disorder (PTSD); and generalized anxiety disorder.  Plaintiff was prescribed Prozac and Lamictal[14] and was instructed to take melatonin as needed.  (Tr. 446-49.)

Plaintiff returned to Dr. Mendez on November 30, 2010, and reported symptoms primarily associated with a viral illness.  It was noted that plaintiff was doing well mentally.  Plaintiff complained that Trazodone made her gain weight.  She was instructed to avoid Trazodone and to take Ambien as needed.  (Tr. 450.)

On January 3, 2011, plaintiff reported to Dr. Mendez that she continued to have difficulty with sleep at night, sleeping an average of three or four hours.  Plaintiff reported being lethargic and having no energy during the day and that she occasionally naps.  Plaintiff reported watching television and cleaning the house during the day.  Plaintiff reported that she does not like going to public places.  Dr. Mendez noted that plaintiff continued to be depressed and continued to need

restless legs syndrome. *Medline Plus* (last revised July 15, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a694007.html>.

[14] Lamictal (Lamotrigine )is used to treat patients with bipolar I disorder. *Medline Plus* (last revised Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

improved sleep.  Plaintiff was instructed to increase her Prozac and Lamictal.  A sleep study was ordered.  ( Tr. 451.)

Plaintiff returned to Dr. Mendez on May 19, 2011, and reported that she had had an intestinal virus for the past three months that she believed was brought on by financial stress.  Plaintiff reported her mood not to be so good and that she continued to be depressed.  Plaintiff reported sleeping better in that she was now getting eight hours of sleep, but she continued to have no energy.  Plaintiff reported that she had "anxiety dreams."  Plaintiff reported having had chronic fatigue syndrome for fifteen years and that she had taken Ritalin to keep her from sleeping constantly.  Plaintiff reported no side effects from her medications.  Mental status examination showed plaintiff to have no thought disorder.  Plaintiff reported that she enjoyed getting out of the house and shopping with her mother.  Plaintiff was instructed to continue with her treatment regimen, and Provigil[15] was prescribed to improve alertness.  (Tr. 452.)

On July 12, 2011, plaintiff reported to Dr. Mendez that she continued to sleep all of the time.  Plaintiff reported not feeling sad but that she had no energy.  Plaintiff reported that Medicaid would not fill the prescription for Provigil, and she requested that she be restarted on Ritalin because she was able to concentrate while

---

[15] Provigil is used to treat excessive sleepiness caused by narcolepsy.  *Medline Plus* (last revised Nov. 20, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602016.html>.

taking such medication. Plaintiff reported that her son lives nearby and works all of the time, so she cooks for both of them and does the laundry and cleaning with his help. Plaintiff was noted to talk a lot about her one-and-a-half-year-old granddaughter. Mental status examination showed no thought disorder or psychotic symptoms. (Tr. 453.)

Plaintiff returned to Dr. Mendez on August 6, 2011, and reported that she was doing pretty good and that her granddaughter keeps her "on her toes." It was noted that plaintiff's son and family recently moved in with her. Plaintiff reported that Ritalin helped in that she no longer sleeps all of the time. Plaintiff reported that she sleeps well at night and has energy. No thought disorder or psychotic symptoms were noted. Plaintiff reported feeling nervous because her doctor advised that she needed surgery on her knee because of bone fragments that were causing a lot of pain. Dr. Mendez instructed plaintiff to continue on her current medication regimen. (Tr. 454.)

On October 10, 2011, plaintiff visited Dr. Mendez and reported that she had been arrested for possession of a controlled substance, Methadone, and had to provide a printout of her prescriptions. Plaintiff reported that she goes to church more because she drives her mother and that church services last two hours. Plaintiff sometimes attends services twice a day. Plaintiff reported that her son and family live with her and that she stays in her room to avoid them because they are

angry all of the time. Plaintiff reported that she continues to sleep more than she should but does so because it takes her away from reality. Plaintiff was instructed to continue with her medication regimen. (Tr. 494.)

Plaintiff visited the Mercy Clinic on October 19, 2011, to establish care. Dr. Korshie Dumor noted plaintiff's history of bipolar disorder for which she sees Dr. Mendez, as well as plaintiff's history of chronic back pain and opiate addiction. It was noted that plaintiff had been taken off of opiates but continued to have back pain. Plaintiff also reported having restless legs at night and that she cannot sleep well, causing her to be tired all day. Plaintiff's current medications included Prozac, Vistaril, and Naproxen.[16] An MRI of the lumbar spine showed mild multi-level degenerative disc disease without evidence of central canal stenosis or neural foraminal narrowing. Physical examination showed normal range of motion but with tenderness over the lower back on deep palpation. No edema was noted. Dr. Dumor noted plaintiff to have a normal mood and affect and to exhibit normal behavior. Plaintiff was diagnosed with chronic back pain and was prescribed Naproxen. Plaintiff was referred to a pain clinic. Plaintiff was also instructed to continue to follow up with psychiatry for bipolar disorder. (Tr. 468-72.)

Plaintiff visited Cynthia G. Dicus, a family nurse practitioner at Mercy

---

[16] Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by various arthritis conditions. *Medline Plus* (last revised July 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

Clinic, on November 4, 2011, with complaints of a recent onset of mid-back pain brought on by lying supine, sitting up, leaning forward, bending, moving her neck, moving her back, turning, twisting, and reaching. Plaintiff reported the pain to worsen with bending and lifting. Plaintiff appeared to be in moderate pain. Range of motion about the lumbar spine was within normal limits, but flexion and extension were limited due to pain. Tenderness to palpation was noted about the thoracic spine. Plaintiff was diagnosed with lumbar strain. Plaintiff was instructed as to proper lifting with avoidance of heavy lifting. Ultram[17] and Robaxin[18] were prescribed, and instruction was given as to back exercises. (Tr. 473-74.)

Plaintiff returned to Ms. Dicus on November 16, 2011, and reported continued mid-back pain with some improvement. Plaintiff reported having pain with bending forward and being unable to sleep because of the pain, but that heat helped. Ms. Dicus noted plaintiff to be in mild pain. Range of motion about the lumbar spine was within normal limits. Plaintiff was diagnosed with thoracic strain and was instructed to continue with heat and back exercises. (Tr. 478.)

On November 30, 2011, plaintiff visited Angela D. Gower, a physician's assistant at the Mercy Clinic, for follow up of her low back pain. Plaintiff

---

[17] Ultram is a narcotic analgesic used to treat moderate to moderately severe pain. *Medline Plus* (last revised Oct. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

[18] Robaxin is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by sprains, strains, and other muscle injuries. *Medline Plus* (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

appeared to be in moderate pain. No tenderness was noted, but range of motion was minimally limited. Straight let raising was negative. Plaintiff was prescribed Ultram and Robaxin. Ms. Gower noted that a referral to pain management remained pending. (Tr. 479.)

Plaintiff returned to Dr. Dumor on December 20, 2011, and reported that Ultram did not control her pain. Plaintiff indicated that she would retry Methadone while waiting to be seen by pain management. Plaintiff's diagnoses were noted to include chronic pain associated with significant psychosocial dysfunction, chronic back pain, depression, chronic fatigue, and osteoarthritis of the knee. Physical and psychiatric examination was unremarkable. It was noted that Ultram would be discontinued and Methadone would be prescribed when plaintiff was next due for a prescription refill. (Tr. 480-83.)

Plaintiff returned to see Ms. Gower at on January 5, 2012, and reported that low dose Methadone was not working well to control her pain. Plaintiff reported that she would rather not take Methadone given its long term side effects. Plaintiff also reported having difficulty sleeping and had swelling of the right knee. Ms. Gower noted plaintiff to be in moderate pain and to walk with a limp. No tenderness was noted about the lumbosacral spine, although minimally limited range of motion was noted. Plaintiff was prescribed Norco for pain and HCTZ for

swelling.  (Tr. 484-85.)  On January 10, Ms. Gower prescribed Savella[19] for myalgia and myositis.  (Tr. 486.)

Plaintiff returned to Dr. Mendez on January 12, 2012, and reported that she continued to be in pain despite taking Savella as prescribed.  Plaintiff reported the pain to be in her low back and to shoot down her legs.  Plaintiff reported that she wanted to take pain medication such as Methadone or oxycodone, but that her physician wanted her to go to a pain clinic.  Dr. Mendez noted that plaintiff looked somber.  Plaintiff reported that she has difficulty sleeping at night but sleeps for about six hours during the day.  Dr. Mendez noted plaintiff to have no thought disorder and no suicidal ideations.  Plaintiff was instructed to increase her Lamictal and to continue with Fluoxetine.  Dr. Mendez advised plaintiff that it would be better for her to restart her pain medication but not at the previous levels, but plaintiff reported that she became too dependent on them.   Dr. Mendez instructed plaintiff to discontinue the Savella and to call Dr. Dumor to request an appointment regarding her pain treatment.  (Tr. 495-96.)

On that same date, January 12, Dr. Mendez completed a Mental RFC Assessment in which she opined that plaintiff's ability to follow work rules, relate to coworkers, deal with the public, and use judgment was good; and that her ability

---

[19] Savella is used to treat fibromyalgia.  *Medline Plus* (last revised Apr. 15, 2014)<http://www. nlm.nih.gov/medlineplus/druginfo/meds/a609016.html>.

to interact with supervisors, deal with work stresses, function independently, and maintain attention/concentration was fair. Dr. Mendez reported that plaintiff's depression and chronic pain limit her ability to concentrate on tasks or physical functions. Dr. Mendez further opined that plaintiff's ability to understand, remember, and carry out simple and/or complex job instructions was fair to good; and that her ability to understand, remember, and carry out detailed, but not complex job instructions was fair. Dr. Mendez opined that plaintiff's ability to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations was good; and that her ability to demonstrate reliability was fair to good. Dr. Mendez reported that plaintiff did not want to be around people or in social situations because of anxiety and depression and was limited by decreased socialization and self-imposed isolation. Dr. Mendez also reported that plaintiff's chronic pain and depression restricted her from lifting ten pounds or more. (Tr. 489-90.)

Plaintiff returned to Dr. Dumor on March 13, 2012, who noted that plaintiff recently restarted Norco that had been prescribed by someone other than him. Dr. Dumor noted plaintiff's history of opiate addiction. It was noted that plaintiff had not yet been seen by the pain management team. Plaintiff currently complained of restless leg symptoms. Dr. Dumor noted plaintiff's current medications to include Neurontin, Robaxin, Savella, Norco, HCTZ, Prozac, and Lamictal. Physical and

psychiatric examination was normal in all respects. Dr. Dumor diagnosed plaintiff with back pain, depression, and restless leg syndrome and prescribed Gabapentin. Dr. Dumor noted that plaintiff needed pain management and needed to be off of narcotic medication. An MRI of the lumbar spine was ordered. (Tr. 502-04.)

Plaintiff visited Dr. Mendez on April 9, 2012, and reported being "peachy." Plaintiff reported that she colored eggs, bought a dress for her granddaughter, went to church, and cooked lunch the previous day. Plaintiff reported sleeping a lot but that she also frequently wakes up. Plaintiff complained of being nervous. Dr. Mendez noted plaintiff not to have any apparent thought disorder or psychotic symptoms. Plaintiff's thinking processes were noted to be intact and she was not homicidal or suicidal. Dr. Mendez noted that plaintiff continued to look depressed. Dr. Mendez diagnosed plaintiff with major depressive disorder, rule out bipolar depression; sexual abuse as a child; PTSD; and generalized anxiety disorder. Plaintiff was assigned a GAF score of 45. Dr. Mendez instructed plaintiff to increase her dosages of Prozac and Lamotrigine. Plaintiff was also prescribed BuSpar[20] and was instructed to continue with Ritalin. It was noted that plaintiff would be seeing a new psychiatrist. (Tr. 499-500.)

Plaintiff returned to Dr. Dumor on April 18, 2012, who noted that plaintiff

---

[20] BuSpar is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety. *Medline Plus* (last revised Apr. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html>.

had recently visited the emergency room after straining a back muscle.[21] Dr. Dumor noted that plaintiff was given pain relief and a muscle relaxant in the emergency room and was discharged. Plaintiff reported improvement in her pain and inquired about a referral to pain management. Dr. Dumor noted recent x-rays of the lumbar spine to yield normal results and that a recent MRI showed mild to moderate focal disc degeneration at L5-S1 with broad-based left paracentral disc protrusion possibly affecting the left S1 nerve root sleeve. The MRI also showed mild to moderate facet arthropathy at the same level. Physical and psychiatric examination was normal in all respects. Dr. Dumor noted it to appear that plaintiff's pain had resolved, and he recommended no new treatment. Pain management was to be informed of the results of plaintiff's recent diagnostic studies. (Tr. 506-09.)

Plaintiff visited Ms. Gower on May 2, 2012, and complained of having left knee pain for four days, which was causing mild distress. Plaintiff also had complaints relating to a cough, insomnia, and chronic uncontrolled pain. Plaintiff's current medications were noted to include Neurontin, Norco, Robaxin, Prozac, and Lamictal. Tenderness to palpation was noted about the knee. Otherwise, physical examination was normal. Plaintiff was prescribed Atarax and was instructed to take over-the-counter cetirizine. X-rays and an MRI were

---

[21] No record of this emergency room visit appears in the record.

ordered.  Plaintiff was advised to continue to seek an appointment with pain management.  (Tr. 510-12.)

## IV.  Additional Evidence Considered by the Appeals Council[22]

On May 18, 2012, plaintiff visited Dr. Marco Baquero who noted plaintiff to be discontented with her medication regimen.  Plaintiff reported that she continued to have chronic fatigue and panic attacks every week.  Dr. Baquero observed plaintiff to have psychomotor retardation and a sad affect.  Plaintiff reported that she experiences mania at times but not as frequently as before.  Dr. Baquero diagnosed plaintiff with bipolar disorder, in partial remission; and panic disorder without agoraphobia.  Plaintiff was instructed to discontinue BuSpar and Ritalin and to continue with Prozac and Lamictal.  Abilify[23] and Klonopin[24] were prescribed.  (Tr. 531.)

Plaintiff returned to Dr. Baquero on June 15, 2012, and reported not being happy with her medication.  Noting that plaintiff "tends to think that she's still having panic attacks," Dr. Baquero opined that it was "very difficult to think that

---

[22] In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision.  The Court must consider this evidence in determining whether the ALJ's decision is supported by substantial evidence.  *Frankl v. Shalala,* 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala,* 23 F.3d 1441, 1444 (8th Cir. 1994).

[23] Abilify is used to treat the symptoms of schizophrenia, bipolar disorder, and depression. *Medline Plus* (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a603012.html>.

[24] Klonopin is used to relieve panic attacks.  *Medline Plus* (last revised July 1, 2010)<http://

somebody on as high doses as she is of Prozac that she will still have panic attacks." Dr. Baquero continued in his diagnoses and treatment regimen. (Tr. 532.)

Plaintiff visited Dr. Dumor on June 18, 2012, and reported that adjustments to her medication improved her depression. Plaintiff reported that she was scheduled to see pain management the following month. Plaintiff's current medications included Abilify, Klonopin, Norco, Robaxin, Atarax, Neurontin, Prozac, and Lamictal. Physical and psychiatric examination was normal in all respects. Plaintiff was diagnosed with depression, chronic back pain, and dental caries. She was instructed to continue with Norco for pain. (Tr. 515-17.)

Plaintiff visited Ms. Gower on July 3, 2012, with complaints relating to a dental condition. No other complaints were noted. (Tr. 519.) On July 16, plaintiff complained of leg swelling despite taking HCTZ on a daily basis. Plaintiff was instructed to apply compression to the affected area. (Tr. 521-24.)

On July 10, 2012, plaintiff reported to Dr. Baquero that she was not doing very well and complained of continued anxiousness, depression, and panic attacks on a daily basis. Plaintiff denied any suicidal or homicidal ideation, but Dr. Baquero noted plaintiff to be very despondent. Plaintiff was instructed to increase the dosages of all of her psychotropic medications. (Tr. 533.)

---

www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

On August 21, 2012, plaintiff reported to Dr. Baquero that she continued to feel anxious. Plaintiff looked depressed and exhibited psychomotor retardation. Plaintiff was noted to be very quiet. Plaintiff was instructed to increase her dosage of Klonopin and to continue with her other medications as prescribed. (Tr. 534.)

On September 4, 2012, plaintiff reported to Ms. Gower that injection therapy by pain management and recent physical therapy did not provide much relief for her chronic back pain. Plaintiff reported that she stopped taking Vicoprofen a couple of weeks prior and that her pain had increased. Plaintiff reported that she did not want to take any additional narcotic pain medications. Ms. Gower noted that plaintiff was in moderate pain. No tenderness of the lumbosacral spine was noted, but range of motion was minimally limited. Physical examination was otherwise normal. Plaintiff was prescribed Ultram and Baclofen[25] and was instructed to continue with physical therapy. (Tr. 525.)

Plaintiff returned to Dr. Baquero on September 25, 2012, and reported that she was doing very well on her medications, stating that they were "really working for her." Plaintiff reported not being depressed, suicidal, or anxious. Plaintiff was continued on her current medication regimen and was instructed to return in three months. (Tr. 535.)

---

[25] Baclofen decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases. *Medline Plus* (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html>.

# V.  The ALJ's Decision

In his decision rendered August 21, 2012, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through September 30, 2013.  The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of September 12, 2008.  The ALJ found plaintiff's degenerative disc disease, osteoarthritis, obesity, depression, PTSD, and generalized anxiety disorder to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15.)  The ALJ determined that plaintiff had the RFC to perform sedentary work, except that she could only

> occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolding; can occasionally balance, stoop, kneel, and crawl; can never crouch; requires the option to alternate to either a sitting or standing position for a period of five minutes after sitting or standing for 30 minutes; and is limited to being able to understand, remember, and carry out simple instructions.

(Tr. 17.)  The ALJ determined that plaintiff could not perform any of her past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ found vocational expert testimony to support a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, order clerk, clerical mailer and inserter, and table worker.  The ALJ thus found plaintiff not to be under a disability from September 12, 2008, through

the date of the decision.  (Tr. 25-26.)

## VI.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether

the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the

record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d

1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff contends that the ALJ erred by improperly discounting the opinion evidence rendered by her treating physicians, Dr. Sievers and Dr. Mendez. For the following reasons, the matter will be remanded for further proceedings.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)*; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

since these sources are likely to be the medical professionals most
able to provide a detailed, longitudinal picture of [a claimant's]
medical impairment(s) and may bring a unique perspective to the
medical evidence that cannot be obtained from the objective medical
findings alone or from reports of individual examinations, such as
consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

the opinion, including the length of the treatment relationship and the frequency of

examination, the nature and extent of the treatment relationship, whether the

treating physician provides support for her findings, whether other evidence in the

record is consistent with the treating physician's findings, and the treating

physician's area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c). The

Regulations further provide that the Commissioner "will always give good reasons

in [the] notice of determination or decision for the weight [given to the] treating

source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Against this backdrop, the undersigned reviews plaintiff's claims regarding

the weight accorded by the ALJ to the treating physicians' opinions in this cause.

A.      Dr. Sievers

In his written decision, the ALJ accorded little weight to the opinion

rendered in Dr. Sievers' October 2009 MSS, reasoning that her treatment with

plaintiff at that time was limited in that she had seen plaintiff on only two

occasions before rendering her opinion; that she did not examine plaintiff for several months prior to rendering her opinion; that her opinion was inconsistent with her treatment notes and appeared to be based upon plaintiff's subjective complaints; and that she provided no objective support for her opinion. Plaintiff contends that these reasons do not constitute "good reasons" to discount this treating physician's opinion inasmuch as they are not supported by, and indeed are contrary to, substantial evidence on the record. Plaintiff's argument is well taken.

The ALJ found that Dr. Sievers' relationship with plaintiff was limited at the time she rendered her opinion in October 2009, stating that she had treated plaintiff on only two prior occasions – once in May 2009 and once in July 2009. (Tr. 22.) A review of the record shows, however, that beginning in February 2008 and continuing through October 2009, Dr. Sievers saw and treated plaintiff for chronic back pain on not less than seven separate occasions. Such treatment included multiple prescriptions for and adjustments to powerful narcotic pain medication and muscle relaxants, including morphine-like medication for severe pain. *See O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir. 2003) (noting that oxycodone is a narcotic similar to morphine). Although the Commissioner argues that the ALJ did not err by considering only those examinations which occurred subsequent to plaintiff's alleged disability onset date, that is, September 2008 (*see* Deft.'s Brief, Doc. #25 at p. 5), the undersigned notes that the ALJ's misstatement of

plaintiff's treatment history with Dr. Sievers was in the context of whether Dr.

Sievers' relationship with plaintiff was that of a treating physician. As such, the

longitudinal history of this relationship, including any period prior to the alleged

disability onset, is relevant to this consideration. Nevertheless, a review of the

record shows that between September 2008 and October 2009, Dr. Sievers saw and

treated plaintiff on five occasions – with each occasion involving medication

management of plaintiff's chronic pain, including repeated prescriptions for

significant narcotic pain medication such as hydrocodone and oxycodone. It

cannot be said, therefore, that the ALJ's finding that Dr. Sievers provided only

"limited" treatment is supported by substantial evidence and constitutes a good

reason to discount her opinion.

To the extent the ALJ stated that Dr. Sievers' opinion was not supported by

her treatment notes or any objective evidence, the undersigned notes that a

consistent diagnosis of chronic back pain, coupled with a long history of pain

management and drug therapy, is an objective medical fact evidencing pain. *Cox*

*v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998). Given that the record shows Dr.

Sievers to have consistently diagnosed plaintiff with chronic back pain and

consistently prescribed significant dosages of narcotic pain medication over a

period of years, it cannot be said that substantial evidence supports the ALJ's

finding that Dr. Sievers' treatment records yielded no objective findings consistent

with her opinion regarding the level of plaintiff's pain. Indeed, the Eighth Circuit in *O'Donnell* noted that a claimant's chronic use of oxycodone actually support allegations of pain instead of detract from them. *O'Donnell,* 318 F.3d at 817.[26]

Accordingly, the reasons given by the ALJ to discount Dr. Sievers' October 2009 MSS are not supported by substantial evidence on the record as a whole. Because the opinion of a treating physician is accorded special deference under the Regulations and is normally entitled to great weight, the ALJ on remand must reconsider the weight given to Dr. Sievers' opinion in light of the totality of the evidence of record. *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010). Inasmuch as the record also shows that plaintiff developed an extensive treating relationship with Dr. Dumor and Ms. Gower at Mercy Clinic since October 2011, the ALJ is encouraged upon remand to contact these treating sources for functional assessments as to how plaintiff's impairments affect her ability to engage in specific work-related activities. *See Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002).

In addition, given substantial evidence that plaintiff was continually

---

[26] Although plaintiff does not challenge the ALJ's credibility determination, a review of the ALJ's reasons given for discrediting plaintiff's complaints show them to likewise be based on a faulty review of the record, as demonstrated by the ALJ's finding that treatment for plaintiff's pain was intermittent and conservative in nature. (*See* Tr. 18-20.) Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined. *Baumgarten v. Chater*, 75 F.3d 366, 368-69 (8th Cir. 1996).

prescribed addictive narcotic painkillers, that she continued to experience pain despite such medication, and that she indeed exhibited evidence of opiate addiction, the ALJ is also encouraged upon remand to consider the addictive quality of this medication that represents a significant potential side effect to plaintiff. *See Krowiorz v. Barnhart*, No. C04-3032-MWB, 2005 WL 715930, at *24 (N.D. Iowa Mar. 30, 2005). In so doing, the undersigned cautions that "[i]t is Congressional policy that the social security laws not be applied to perpetuate drug addiction." *Saleem v. Chater*, 86 F.3d 176, 179 (10th Cir. 1996) (citing 142 Cong. Rec. S3114-02, S3119 (daily ed. Mar. 28, 1996) (statement of Sen. Roth)). As such, claimants should not be encouraged to return to work addicted to narcotic painkillers where such addiction is what keeps them from feeling severe pain. *Id.* at 179-80.

B.     Dr. Mendez

The ALJ also accorded little weight to Dr. Mendez's opinion rendered in her January 2012 Mental RFC Assessment, reasoning that Dr. Mendez provided no support for her opinion; that the opinion appeared to be based on diagnoses and plaintiff's discredited subjective complaints; and that the opinion relating to plaintiff's physical limitations was outside the scope of her treatment relationship with plaintiff. The ALJ did not err in this determination.

        Throughout plaintiff's treatment with Dr. Mendez, as well as with other

providers, plaintiff presented with essentially normal mental status examinations with her sad appearance and/or flat affect to be the only aberration. *See Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (ALJ permitted to discount treating psychiatrist's opinion as to disabling symptoms where nearly all mental status examinations revealed no abnormalities). In addition, upon beginning treatment with Dr. Mendez, which included therapy and medication, plaintiff's symptoms appeared to be controlled such that she was able to engage in normal everyday activities and objectively reported improvement in her condition. Impairments that are controllable by treatment or medication are not considered disabling. *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014). The post-hearing treatment notes from Dr. Baquero submitted to the Appeals Council do not change this result inasmuch as such evidence shows that continued adjustment to plaintiff's medication resulted in resolution of plaintiff's mental symptoms.

Further, as noted by the ALJ, Dr. Mendez's treatment records and the RFC Assessment itself provide no support for the opined limitations. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). A diagnosed mental condition does not necessarily equate with a finding of disability. *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011); *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). To the extent Dr. Mendez opined that plaintiff was physically

limited to lifting no more than ten pounds, the ALJ properly discounted this opinion. Where a provider renders an opinion outside of the scope of her treatment and/or specialty, an ALJ does not err in according that opinion little or no weight. *See Brosnahan v. Barnhart*, 336 F.3d 671, 676 (8th Cir. 2003) (no error in discounting opinion of psychologist where it is based partly on consideration of physical impairments).

Accordingly, the ALJ's determination to accord little weight to Dr. Mendez's January 2012 Mental RFC Assessment is supported by good reasons and substantial evidence. The Court therefore defers to this determination.

## VII. Conclusion

The ALJ improperly analyzed and discounted the opinion evidence rendered by Dr. Sievers in this case with such improper analysis appearing to be based on an incomplete review of the record and/or misapprehension of the evidence. Upon remand, the ALJ shall reconsider the weight given to Dr. Sievers' opinion in light of the totality of the evidence of record. In the event the ALJ continues not to accord controlling weight to Dr. Sievers' opinion, he shall provide good reasons for the weight accorded to the opinion, and such reasons shall be supported by substantial evidence on the record as a whole The ALJ is encouraged upon remand to obtain functional assessments from plaintiff's other treating sources in order to assist him in making an informed decision regarding the extent to which plaintiff's

impairments affect her ability to perform work-related activities.  *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. §§ 404.1517, 416.917.

Upon receipt of any such additional information, the ALJ shall reconsider the record as a whole, reevaluate the credibility of plaintiff's own description of her symptoms and limitations, and reassess plaintiff's RFC.  Such reassessed RFC shall be based on some medical evidence in the record and shall be accompanied by a discussion and description of how the evidence supports each RFC conclusion.  *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the matter is **REMANDED** for further proceedings consistent with this opinion.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/ Terry I. Adelman
_____
TERRY I. ADELMAN
UNITED STATES MAGISTRATE JUDGE


Dated this 28th day of January, 2015.